**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 14, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
———————————————————

CARLOS TERAN,

    Plaintiff - Appellant,

v.

GB INTERNATIONAL, S.P.A.; GB
MIAMI, S.R.L.; AMERICAN CRANE &
TRACTOR PARTS, INC.,

    Defendants - Appellees.

No. 15-3102
(D.C. No. 2:11-CV-02236-JAR)
(D. Kan.)

———————————————————

**ORDER AND JUDGMENT**[*]
———————————————————

Before **KELLY**, **MATHESON**, and **McHUGH**, Circuit Judges.
———————————————————

Carlos Teran appeals from the grant of summary judgment to Defendants GB

International, S.p.A. ("GB International"), GB Miami, S.r.l. ("GB Miami"), and

American Crane and Tractor Parts, Inc., ("ACTP"). He also appeals from the grant of

summary judgment to GB Miami on its counterclaim against him. Exercising jurisdiction

under 28 U.S.C. § 1291, we affirm.

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I.  BACKGROUND

### A.  *Factual History*[1]

Mr. Teran was a shareholder and Managing Director of ACTP, a tractor supply company.  In 2004, ACTP entered a Supply Agreement with GB International, requiring ACTP to purchase parts from GB International.  GB International later became the majority owner of ACTP.

GB International allegedly used its control over ACTP to help its subsidiary, CGR Ghinassi, S.p.A. ("CGR"), at ACTP's expense.  According to Mr. Teran, GB International amended the Supply Agreement to require ACTP to buy substantially all of its tractor supply parts from CGR in Italy.  As a result, ACTP paid a premium ranging from 15 to 50 percent and experienced three- to six-month delays in delivery, frequently leaving ACTP without inventory.  GB International also instructed CGR to solicit ACTP's customers in Latin America at the expense of ACTP.  Finally, GB International raised the minimum price at which ACTP could sell certain parts, causing ACTP's prices in Latin America to exceed those of CGR.  As a result, ACTP lost customers to CGR.

Due to the foregoing, Mr. Teran submitted a resignation letter dated July 25, 2010, to ACTP, which stated, "it is my intention to sever my employment relationship with [ACTP], effective at the end of the business day on October 29, 2010."  App. at 607.  He

---

[1] Because Mr. Teran appeals a summary judgment ruling, we "view all of the facts in the light most favorable to [him] and draw all reasonable inferences from the record in [his] favor." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1220 (10th Cir. 2015) (quotations omitted).

explained that his "efforts to grow the company, which would [have] result[ed] in increased bonuses, dividends and stock value for [him], [had] been completely frustrated." *Id.* In a letter dated August 5, 2010, the president of ACTP responded, "Your resignation effective as of the end of the business day on October 29, 2010 is accepted by the Company." *Id.* at 325.

In the event Mr. Teran resigned, the Shareholders Agreement between ACTP and its shareholders had granted GB Miami—an affiliate of GB International and a shareholder of ACTP—a call right to purchase all of Mr. Teran's shares for one dollar.[2] GB Miami sent Mr. Teran a written "Section 2.9(B) Exercise Notice" on September 16, 2010, stating he had "resigned from his employment with [ACTP]," giving GB Miami the right to purchase his stock for one dollar under Section 2.9(B)(d) of the Shareholders Agreement. *Id.* at 614. GB Miami requested that Mr. Teran deliver his stock certificates within 180 days of the notice.

ACTP then persuaded Mr. Teran to stay. On October 29, 2010, the day Mr. Teran had planned for his resignation to become effective, the president of ACTP sent Mr. Teran a letter stating:

> [ACTP] is pleased to extend the following offer of employment to you:
>
>> 1. You will be employed in the full-time position of Managing Director of Latin American Markets, reporting to the President and CEO and Board of Directors of ACTP.

---

[2] The parties do not explain the nature of the relationship between GB International and GB Miami.

2. Your employment will begin on November 1, 2010.

. . . .

If you choose to accept our offer of employment and agree to the above terms, please sign, date and return a copy of this letter to my attention by no later than 5:00 pm (eastern daylight time) October 29, 2010.

*Id.* at 616-17. Mr. Teran accepted the offer and signed the agreement ("Letter Agreement") before 5:00 p.m. on October 29, 2010.

On December 1, 2010, the president of ACTP sent Mr. Teran a letter regarding GB Miami's Section 2.9(B) Exercise Notice. Enclosed with the letter was a cashier's check for one dollar and documents necessary to transfer his shares to GB Miami. The letter asked Mr. Teran to sign and return the documents transferring ownership within eight days. Mr. Teran refused. ACTP subsequently cancelled his stock certificates and recorded the shares as transferred to GB Miami on ACTP's books.

Mr. Teran resigned on December 23, 2010.

B. *Relevant Documents*

1. **2006 Employment Agreement**

Mr. Teran signed an employment agreement with ACTP in 2006 ("2006 Employment Agreement") covering the period between November 9, 2006, and April 30, 2015. The 2006 Employment Agreement included the following provision:

5. **Termination**. Employee's employment by the Company under this Agreement shall be terminated upon the earliest to occur of the following events:

(a) *Termination by Employee*. Employee's resignation or other voluntary departure, in which case, he will no longer serve as an

- 4 -

"employee" or represent the Company from the date of such resignation or ceasing of services.

Aplt. App. at 661.[3]

## 2. **ACTP's Shareholders Agreement**

On November 9, 2006, ACTP signed a Shareholders Agreement with its shareholders, which included GB International, GB Miami, Mr. Teran, and various other individuals.

Section 1.3 of the Shareholders Agreement included the following provision:

1.3 Decisions of the Board. Each of the following decisions shall require the consent of the Board of Directors and the approval of the Continuing Shareholders[4] . . . :

. . . .

(b) Any amendment or modification by the Company of the Supply Agreement . . . .

*Id.* at 282. We refer to this language in Section 1.3 as the "Approval Rights Provision."

Section 2.9(B) of the Shareholders Agreement included the following language:

(d) If . . . Carlos terminates the Carlos Employment Agreement under paragraph 5(a) of such agreement within ten (10) years of April 29, 2005, then, . . . . GB Miami shall have a call right, exercisable immediately, and continuing thereafter, for a total purchase price of One Dollar ($1.00) for all of Carlos' ownership in the Company; . . .

(e) Beginning on the eighth (8th) anniversary of April 29, 2005, and continuing indefinitely thereafter, GB Miami shall have the right, but not

---

[3] The agreement defined "Employee" as Mr. Teran and "Company" as ACTP.

[4] The Shareholders Agreement defined "Continuing Shareholders" as certain individual shareholders uninvolved in this appeal.

the obligation, to require Carlos to sell all, but not less than all, of the
shares owned by him . . . to GB Miami for a price equal to the Call
Valuation Price. . . .

*Id.* at 293.

Finally, the Shareholders Agreement included a choice of law provision, stating

the agreement "shall be governed by and construed in accordance with the internal

substantive laws and not the choice of law rules of the State of Kansas." *Id.* at 297.

C. ***Procedural History and GB Miami's Exercise of the Second Call Right***

On April 22, 2011, Mr. Teran brought this diversity action in the United States

District Court for the District of Kansas, eventually naming GB International, GB Miami,

and ACTP as defendants in the First Amended Complaint, which Defendants moved to

dismiss. The district court granted their motion in part and denied it in part without

prejudice to seek to leave to amend.

1. **GB Miami's Exercise of the Second Call Right**

On May 29, 2013, while the litigation was pending, ACTP sent Mr. Teran a letter

enclosing an exercise notice from GB Miami. The notice explained: to whatever extent

the First Call Right may have been invalid and to whatever extent Mr. Teran therefore

retained ownership of his stock, GB Miami sought to purchase it a second time under

Section 2.9(B)(e) of the Shareholders Agreement because the eight-year anniversary date

had passed. The letter and notice calculated the purchase price—more specifically, the

Call Valuation Price referred to in Section 2.9(B)(e) of the Shareholders Agreement—to

be zero dollars based on the formula in the Shareholders Agreement and ACTP's poor

financial performance.

## 2. Second Amended Complaint and GB Miami's Counterclaim

Mr. Teran then filed a Second Amended Complaint.

Counts One and Two were brought derivatively on ACTP's behalf. Count One alleged GB International breached its fiduciary duty of good faith by amending the Supply Agreement to benefit CGR at ACTP's expense. Count Two alleged GB International tortiously interfered with ACTP's business relationships in Latin America.

Counts Three through Five were brought individually on Mr. Teran's behalf. Count Three sought a declaratory judgment that Mr. Teran retains ownership over his shares because he did not resign, and the First Call Right consequently did not exist. Count Four, brought alternatively to Count Three, alleged GB Miami and GB International breached the Shareholders Agreement when GB Miami exercised the First Call Right, even though Mr. Teran had not resigned. Count Five alleged GB International and ACTP breached the Shareholders Agreement by amending the Supply Agreement without obtaining the approvals required under the Approval Rights Provision.

GB Miami filed a counterclaim seeking a declaratory judgment that "[b]y virtue of GB Miami's exercise of the First Call Right—and if not, by virtue of its exercise of the Second Call Right—Teran is no longer a shareholder in ACTP, and thus Teran has no standing to pursue derivative claims on behalf of ACTP." App. at 212. Mr. Teran asserted four affirmative defenses in his answer to GB Miami's counterclaim: unconscionability, prior breach, unclean hands, and waiver.

3. **Summary Judgement for Defendants and the Denial of Leave to Amend Counts One and Two**

The district court granted summary judgment:

- To GB Miami on its counterclaim, concluding (1) the Letter Agreement indicated Mr. Teran resigned on October 29, 2010, as a matter of law, (2) GB Miami's exercise of the First Call Right was therefore valid, and (3) Mr. Teran's four affirmative defenses to the counterclaim were meritless.[5]

- To GB International on Claims One and Two, concluding Mr. Teran lost shareholder standing to bring derivative claims on ACTP's behalf when GB Miami exercised the First Call Right. Mr. Teran's opposition brief had requested leave to amend Counts One and Two by bringing them individually should the court rule they failed as derivative claims. The district court's summary judgment order denied that request.

- To GB International and GB Miami on Claims Three and Four based on its conclusion that Mr. Teran resigned on October 29, 2010, as a matter of law, and GB Miami's exercise of the First Call Right was therefore valid. [Dkt. 165 at 12.]

- (1) To GB International on Count Five, concluding the Approval Rights Provision did not bind GB International, and (2) to ACTP on Count Five, concluding that count failed as an individual claim because Mr. Teran alleged no individual harm.

The district court entered final judgment for Defendants. Mr. Teran appeals from the grants of summary judgment and from the denial of his request to amend Counts One and Two.

---

[5] Because the court decided GB Miami's exercise of the First Call Right was valid, it declined to address whether its exercise of the Second Call Right was also valid.

## II. **DISCUSSION**

We begin by affirming summary judgment for GB Miami on its counterclaim on the ground that its exercise of the Second Call Right was valid. We also affirm summary judgment on:

- Counts One and Two because, when GB Miami exercised its Second Call Right, Mr. Teran lost shareholder standing to pursue these derivative claims on ACTP's behalf.

- Count Three because Mr. Teran did not own shares in ACTP after GB Miami exercised its Second Call Right.

- Count Four because Mr. Teran did not allege the non-performance of a duty to support his breach of contract claim.

- Count Five because Mr. Teran alleged harm to ACTP but not to himself.

Finally, we affirm the denial of Mr. Teran's request to amend Counts One and Two.

### A. *Standard of Review and Summary Judgment Standard*

We review a grant of summary judgment de novo. *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 (10th Cir. 2015). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, we view the evidence in the light most favorable to the non-moving party. *Osborne*, 798 F.3d at 1266.

### B. *GB Miami's Counterclaim*

We affirm the district court's grant of summary judgment on GB Miami's counterclaim seeking a declaratory judgment that Mr. Teran is no longer a shareholder in ACTP. The district court granted GB Miami summary judgment on the basis of the First

Call Right.  It reasoned Mr. Teran resigned as a matter of law, his resignation triggered the First Call Right, and he therefore lost his shares when GB Miami exercised the First Call Right.  We affirm on the alternative ground that GB Miami validly exercised the Second Call Right.  *See Knight v. Mooring Capital Fund, LLC*, 749 F.3d 1180, 1186 (10th Cir. 2014) ("[W]e may affirm on any ground supported by the record.").

The Second Call Right arose from Section 2.9(B)(e) of the Shareholders Agreement:

> Beginning on the eighth (8th) anniversary of April 29, 2005, and continuing indefinitely thereafter, GB Miami shall have the right, but not the obligation, to require Carlos to sell all, but not less than all, of the shares owned by him . . . to GB Miami for a price equal to the Call Valuation Price. . . .

App. at 293.  This provision gave GB Miami the right to purchase all of Mr. Teran's stock beginning April 29, 2013.

On May 29, 2013, ACTP sent Mr. Teran a letter, enclosing an exercise notice from GB Miami.  The letter and notice explained that, to whatever extent the First Call Right may have been invalid and to whatever extent Mr. Teran therefore retained ownership of his equity, GB Miami sought to purchase his stock a second time now that April 29, 2013, had passed.  The letter and notice calculated the Call Valuation price based on the formula in the Shareholders Agreement, producing a Call Valuation Price of zero dollars.

Mr. Teran has not disputed that GB Miami sought to exercise the Second Call Right following April 29, 2013, as required by the Shareholders Agreement, either in district court or on appeal.  He has not challenged the adequacy of GB Miami's exercise

- 10 -

notice or the manner in which GB Miami exercised the Second Call Right. Nor has he disputed the accuracy of GB Miami's calculations.[6]

He instead asserted four affirmative defenses in district court: unconscionability, prior breach, unclean hands, and waiver. The court rejected all of these defenses, which Mr. Teran now claims was error. Two of the defenses—unclean hands and waiver—concern only the First Call Right.[7] Because we resolve GB Miami's counterclaim based

---

[6] In district court, Mr. Teran challenged only the manner in which Defendants offered evidence of their calculations under District of Kansas Local Rule 56.1(d), which provides, "Where facts referred to in an affidavit or declaration are contained in another document, such as a deposition, interrogatory answer, or admission, a copy of the relevant excerpt from the document must be attached."

In moving for summary judgment, Defendants supported their calculations with two declarations, one from Stanley House, an accountant at ACTP's independent auditor, House Park Dobratz & Wiebler, P.C. and the other from Paul King, ACTP's president. Mr. House's declaration stated that, in March 2013, on ACTP's request, he reviewed ACTP's financial records and determined ACTP's EBITDA in 2010, 2011, and 2012; its average EBITDA over those three years; its outstanding balances on its debt obligations as of December 31, 2012; and its net financial position as of that same date. The declaration listed all of these values and stated his firm had sent Mr. King a letter including this information on March 20, 2013. The letter was attached to the declaration. Mr. King's declaration stated that, on March 20, 2013, ACTP's independent financial auditor determined the above-mentioned values. The declaration explained how ACTP used them to calculate a Call Valuation Price of zero dollars.

Mr. Teran argues Defendants' declarations were inadequate under Rule 56.1(d) because Defendants failed to attach all of the financial records Mr. House used to determine the values in the March 20, 2013 letter. We disagree. Rule 56.1(d) provides only that, when facts referred to in a declaration are contained in another document, a party must attach that document. Here the declarations referred to the March 20, 2013 letter, which did not itself refer to other documents. Defendants attached that letter in compliance with the rule. If Mr. Teran wished to obtain further records that led to the development of the letter, he was free to request them during discovery.

[7] In a section of his district court opposition brief separate from his unclean hands analysis, Mr. Teran argued in passing that GB Miami could not exercise the Second Call Right for zero dollars based on "the fundamental princip[le] that one cannot benefit from

Continued . . .

on the Second Call Right, we address only the remaining two defenses—

unconscionability and prior breach. Because these two defenses fail as to the Second

Call Right, we affirm.

### 1. **Unconscionability**

Mr. Teran alleges the Shareholders Agreement was unconscionable because of

unequal bargaining power. He asserts "he was given the [Shareholders Agreement]

approximately one hour before the merger was to close, and under pressure to get the deal

closed, he signed." Aplt. Br. at 25. The district court rejected this defense, concluding

Mr. Teran's allegations of unequal bargaining power were insufficient to render the

Shareholders Agreement unconscionable. We agree.

We evaluate Mr. Teran's unconscionability defense under Kansas law based on

the choice of law provision in the Shareholders Agreement. Under Kansas law, the

"doctrine of unconscionability is . . . directed against one-sided, oppressive and unfairly

surprising contracts, and not against the consequences per se of uneven bargaining power

or even a simple old-fashioned bad bargain." *Wille v. Sw. Bell Tel. Co.*, 549 P.2d 903,

907 (Kan. 1976). Accordingly, "unequal bargaining position alone is not enough to find

a contract term unconscionable. For a contract term to be unconscionable, there must be

---

his own wrongdoing." App. at 365. He asserted, "Since Teran alleges that Defendants caused ACTP's earnings as well as the value of his shares to decrease, Defendants cannot as a matter of law be permitted to . . . call Teran's shares due for no money." *Id.* Whatever the nature of this argument—whether an unclean hands argument or otherwise—it fails. Mr. Teran alleged GB International amended the Supply Agreement to benefit CGR at ACTP's expense. He alleged no facts indicating GB Miami was involved, nor did he allege any other misconduct by GB Miami that hurt ACTP.

some type of deceptive practice associated with the term." *Aves ex rel. Aves v. Shah*, 906 P.2d 642, 652 (Kan. 1995). [8] Mr. Teran alleges unequal bargaining power without alleging a deceptive practice. His defense therefore fails. [9]

2. **Prior Breach**

Mr. Teran's prior breach defense contends GB Miami may not assert any call right under the Shareholders Agreement because it previously breached that same agreement. He asserts GB Miami breached the Shareholders Agreement by failing to oppose GB International's amendment of the Supply Agreement, which itself allegedly violated the Approval Rights Provision. The district court rejected this defense, concluding (1) Mr. Teran alleged a prior breach by GB International, not GB Miami—the party with the call right, and (2) he cited no evidence or authority indicating GB International's alleged breach should be imputed to GB Miami. We agree.

"When the federal courts are called upon to interpret state law, the federal court must look to the rulings of the highest state court, and, if no such rulings exist, must endeavor to predict how that high court would rule." *Johnson v. Riddle*, 305 F.3d 1107, 1118 (10th Cir. 2002). The Kansas Supreme Court has yet to address the effect of a

---

[8] Mr. Teran argues only the Kansas Consumer Protection Act—not Kansas common law—requires unequal bargaining power to be accompanied by a deceptive practice. The Kansas Supreme Court's bright-line holding in *Aves*—a case involving common law unconscionability—indicates otherwise.

[9] Mr. Teran additionally argues Section 2.9(B)(d) is substantively unconscionable. Because Section 2.9(B)(d) pertains only to the First Call Right, we need not address this argument.

party's prior breach on a subsequent attempt to enforce its contractual rights. We predict it would adopt the widespread principle that "a party's failure to perform its obligation under a dependent covenant results in the suspension of the complying party's obligation to perform under the agreement." 14 Williston on Contracts § 43:5 (4th ed.) (collecting cases); *see also* Restatement (Second) of Contracts § 237 (Am. Law Inst. 1981) (stating generally, "it is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time" (collecting cases)).

Mr. Teran's defense fails under this principle for two reasons.

First, as explained above, a prior breach defense requires the party asserting the contractual right to be the party who committed the prior breach. Mr. Teran's defense fails to meet this requirement. He alleged GB International, not GB Miami, breached the Approval Rights Provision.

Second, Mr. Teran asserts GB Miami was "a party to [GB International's] prior breach" because "[t]here is no evidence in the record that GB Miami opposed [GB International's] amendments of the Supply Agreement that were procedurally improper as they lacked the required approval . . . . " Aplt. Br. at 28. As the district court noted, there is no evidence or authority supporting this argument. On the contrary, Kansas courts generally respect the corporate form. Absent certain factors, which Mr. Teran does not argue exist, corporations in the same corporate family are generally not liable for each other's conduct. *See Dean Operations, Inc. v. One Seventy Assocs.*, 896 P.2d 1012, 1016-22 (Kan. 1995) (explaining factors).

- 14 -

\* \* \* \*

We therefore affirm because GB Miami validly exercised the Second Call Right.[10]

## C. *Counts One and Two*

We also affirm the grant of summary judgment on Counts One and Two. Count One alleged GB International breached its fiduciary duty of good faith by amending the Supply Agreement to benefit CGR at ACTP's expense. Count Two alleged GB International tortiously interfered with ACTP's business relationships in Latin America.

---

[10] We also reject Mr. Teran's argument that the district court abused its discretion in managing the parties' briefing on the affirmative defenses. Defendants' motion for summary judgment did not address the affirmative defenses in Mr. Teran's answer to GB Miami's counterclaim. Mr. Teran raised these defenses in his opposition motion. Defendants then addressed them for the first time in their reply brief. The district court, acting sua sponte, ordered Mr. Teran to file a sur-reply responding to the new arguments in Defendants' reply brief. Mr. Teran argues this order for a sur-reply was an abuse of discretion; he argues the district court should have denied GB Miami summary judgment based on Defendants' failure to address the affirmative defenses in their original motion for summary judgment.

Whether to grant a sur-reply is a supervision of litigation question that we review for abuse of discretion. *See Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006); *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998). When a party moves for summary judgment, the non-movant is entitled to "notice and a reasonable time to respond" to its arguments. Fed. R. Civ. P. 56(f); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (explaining a sua sponte grant of summary judgment is proper only if the non-movant was on notice it must come forward with all its evidence). "Thus, when a moving party advances in a reply new reasons and evidence in support of its motion for summary judgment, the nonmoving party should be granted an opportunity to respond." *Beaird*, 145 F.3d at 1164.

The court acted within its discretion in ordering a sur-reply. The order gave Mr. Teran adequate notice and time to respond to Defendants' reply. It also gave the court the opportunity to rule on the summary judgment motion with the benefit of full merits briefing.

We affirm summary judgment for GB International on both counts because Mr. Teran lost shareholder standing to continue litigating these derivative claims when GB Miami exercised the Second Call Right. We also affirm the denial of Mr. Teran's request to amend both claims to bring them individually rather than derivatively.

1. **Summary Judgment**

    a. *Legal Standard*

        i. <u>Shareholder Standing Requirements</u>

To maintain a derivative suit in most jurisdictions, a shareholder must own shares (1) at the time of the alleged misconduct, (2) when the litigation commenced, and (3) throughout the litigation. *See* 3 James D. Cox & Thomas Lee Hazen, Treatise on the Law of Corporations § 15:9 (3d ed. 2010) (explaining these requirements exist under Federal Rule of Civil Procedure 23.1 and most state law). The last of these requirements is commonly referred to as the "continuous ownership requirement." *See id.*; *see also Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co. (U.S.A.)*, 677 F.3d 178, 182-83 (3d Cir. 2012) (explaining Rule 23.1 creates this requirement); *Quinn v. Anvil Corp.*, 620 F.3d 1005, 1012 (9th Cir. 2010) (same).

The purpose of this requirement is to ensure adequate representation: "because a shareholder will receive at least an indirect benefit (in terms of increased shareholder equity) from any corporate recovery, he has an adequate interest in vigorously litigating the claim." *Portnoy v. Kawecki Berylco Indus., Inc.*, 607 F.2d 765, 767 (7th Cir. 1979). In contrast, "[a] non-shareholder or one who loses his shareholder interest during the course of the litigation may lose any incentive to pursue the litigation adequately." *Id.*

For example, "a former shareholder, who would not benefit from a corporate recovery, might be willing to accept an improper or inadequate settlement." Am. Law Inst., Principles of Corp. Governance: Analysis and Recommendations § 7.02 cmt. d (1994).

It remains uncertain whether Federal Rule of Civil Procedure 23.1, which imposes the continuous shareholder requirement, or state law controls on this issue in diversity actions.[11] The parties have not addressed this question. They have cited case law from Missouri, where ACTP is incorporated, and interpreted those cases to impose a continuous ownership requirement.[12]

Regardless of whether Rule 23.1 or Missouri law governs, we conclude the continuous ownership requirement applies here. The federal rule imposes a continuous shareholder requirement. *Santomenno*, 677 F.3d at 182-83; *Quinn*, 620 F.3d at 1012. Missouri law appears to be silent on whether the requirement exists,[13] but we predict the

_____

[11] *See Quinn*, 620 F.3d at 1013 n.5 ("The continuous ownership requirement imposed by Rule 23.1 of the Federal Rules of Civil Procedure is procedural and therefore applies in diversity actions such as this one." (citing *Kona Enters., Inc. v. Estate of Bishop*, 179 F.3d 767, 769 (9th Cir. 1999))); *Silverstein ex rel. Tetragon Fin. Grp. Ltd. v. Knief*, 843 F. Supp. 2d 441, 443-45 (S.D.N.Y. 2012) (similar). *But see* 7C Charles Alan Wright et al., Federal Practice & Procedure § 1829 (3d ed. 2007) (noting there is "still some uncertainty" whether Rule 23.1 applies in diversity and noting several considerations indicating state law applies).

[12] We agree that if state law governs this issue, the law of Missouri, the state of ACTP's incorporation, applies. The district court applied Missouri law to Counts One and Two, and the parties' appeal briefs cite Missouri law. The choice of Kansas law in the Shareholders Agreement governs matters addressed in that agreement and does not extend to the requirements to bring a derivative suit.

[13] In discussing the continuous ownership requirement, the district court and Defendants cited *K-O Enterprises, Inc. v. O'Brien*, 166 S.W.3d 122, 130 (Mo. Ct. App.

Continued . . .

- 17 -

Missouri Supreme Court would adopt the continuous shareholder requirement for two reasons. First, Missouri Rule of Civil Procedure 52.09 is consistent with the rationale of Rule 23.1's continuing ownership requirement, as explained above. Rule 52.09 states, "The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association." Second, the continuous ownership requirement is the majority rule. *See* 3 James D. Cox & Thomas Lee Hazen, Treatise on the Law of Corporations § 15:9 (3d ed. 2010) (explaining most jurisdictions require continuous ownership).

ii. Equitable Exception to Shareholder Standing Requirements

Various jurisdictions have created equitable exceptions to the shareholder standing requirements. *See Kona Enters.*, 179 F.3d at 770 (discussing different jurisdictions' equitable exceptions). Mr. Teran relied on *Eastwood v. Nat'l Bank of Commerce*, 673 F. Supp. 1068 (W.D. Okla. 1987), in district court.

In *Eastwood*, the plaintiff brought a derivative action on behalf of a corporation. Prior to bringing suit, he lost his shares when a loan they secured was foreclosed. The district court nonetheless allowed him to pursue his derivative claims because he alleged

---

2005), and *Schwartz v. Custom Printing Co.*, 926 S.W.2d 490, 494 (Mo. Ct. App. 1996), but these cases are distinguishable. The courts held plaintiffs had no standing to initiate suits because they lost their shares before the litigation commenced. They did not address whether the continuous shareholder requirement applies, causing a plaintiff who loses his or her shares mid-litigation to lose standing.

that the defendants had fraudulently induced him to take certain actions leading to the default of the loan and the loss of his shares. It reasoned:

> the Tenth Circuit has not been hesitant to find that a plaintiff who has lost his technical shareholder status in a transaction permeated by fraud is an "equitable" shareholder, with standing to sue derivatively, *see Frey v. Frankel*, 443 F.2d 1240, 1244 (10th Cir. 1971); *Amen v. Black*, 234 F.2d 12, 23 (10th Cir. 1956), at least where the plaintiff seeks to set aside the fraudulent transaction in which he lost his technical or legal shareholder status, *see Amen v. Black*, 234 F.2d at 23.

*Eastwood*, 673 F. Supp. at 1077. *Frey v. Frankel*, cited in *Eastwood*, recognized equitable shareholder standing when a plaintiff alleged defendants fraudulently induced him to transfer his shares. 443 F.2d at 1242-44. *Amen v. Black* similarly held plaintiffs had equitable ownership over stock when they alleged they were fraudulently induced to part with it. 234 F.2d at 21.

b. *Analysis*

Mr. Teran concedes he has not continuously owned ACTP stock because he lost his shares when GB Miami exercised the Second Call Right. He seeks shareholder standing on equitable grounds.

In district court, Mr. Teran invoked the language in *Eastwood* quoted above. In ruling against him, the district court held *Eastwood* did not apply because Mr. Teran failed to allege fraud. We agree. Unlike the plaintiffs in *Eastwood*, *Frey*, and *Amen*, Mr. Teran did not allege GB Miami fraudulently induced him to transfer his shares at any point.

Mr. Teran invokes various other equitable exceptions for the first time on appeal. *See* Aplt. Br. at 36-40. He waived these arguments by raising them for the first time on

- 19 -

appeal without arguing plain error.  *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011) ("[T]he failure to argue for plain error and its application on appeal . . . marks the end of the road for an argument for reversal not first presented to the district court.").  We therefore affirm as to Counts One and Two, concluding Mr. Teran fails to satisfy the continuous shareholder requirement and that he does not fall within an equitable exception.

2. **The Denial of Mr. Teran's Request to Amend**

In his response to Defendants' motion for summary judgment, Mr. Teran requested leave to amend Counts One and Two to bring them as individual claims should the district court decide he lost shareholder standing to bring them as derivative claims.  The district court denied Mr. Teran leave to amend.  We affirm.

a. *Additional Procedural History*

Mr. Teran brought Counts One and Two as individual claims in the First Amended Complaint.  Defendants moved to dismiss both counts, arguing he could not bring these claims individually because he failed to allege individual harm.  The district court agreed. It dismissed both counts without prejudice to seek leave to amend the First Amended Complaint.

GB Miami then exercised the Second Call Right, after which Mr. Teran filed the Second Amended Complaint.  He amended Counts One and Two by bringing them as derivative claims, not by adding allegations of individual harm.

Defendants moved for summary judgment.  Mr. Teran's response brief noted that, if the district court decided he lacked shareholder standing to bring Counts One and Two

derivatively, he sought leave to amend those counts to bring them as individual claims (as he had in the First Amended Complaint).

Mr. Teran argued such leave would be proper based on Defendants' use of a "gotcha" tactic. He alleged they (1) moved to dismiss the individual claims in Counts One and Two of the First Amended Complaint, arguing they should have been brought derivatively, (2) delayed the litigation in bad faith beyond April 29, 2013, so they could exercise the Second Call Right, and then (3) reversed course by arguing Counts One and Two—now derivative claims in the Second Amended Complaint—failed because Mr. Teran lost shareholder standing when GB Miami exercised either the First or Second Call Right.

The district court granted summary judgment to Defendants and denied Mr. Teran leave to amend Counts One and Two. Between the filing of Defendants' reply and Mr. Teran's sur-reply, the court had held a final pretrial conference and entered a final pretrial order listing Mr. Teran's claims. It therefore construed Mr. Teran's request for leave to amend Counts One and Two as an attempt to amend the final pretrial order. In evaluating this request, it applied Federal Rule of Civil Procedure 15(a)(2), which provides a "court should freely give leave" to amend the pleadings "when justice so requires."

The court denied Mr. Teran's request to amend Counts One and Two under Rule 15(a)(2) for two reasons. First, it rejected Mr. Teran's "gotcha tactic" theory, noting Defendants had consistently argued Mr. Teran lost his shares when GB Miami exercised the First Call Right. Second, it found Mr. Teran's request untimely.

b. *Analysis*

Rule 15(a) generally addresses all "Amendments Before Trial." Rule 15(a)(1) concerns amendments to pleadings made "as a matter of course" within 21 days of certain events—in the case of complaints, within 21 days of service. Rule 15(a)(2) covers amendments to pleadings "[i]n all other cases" before trial. Because Mr. Teran sought leave to amend before trial but more than 21 days after service, Rule 15(a)(2) applies. Under Rule 15(a)(2), a "court should freely give leave" to amend the pleadings "when justice so requires."[14]

We review decisions denying leave to amend under Rule 15(a)(2) for abuse of discretion. *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1117 (10th Cir. 2009). A district court abuses its discretion when it "clearly err[s] or venture[s] beyond the limits of permissible choice under the circumstances" or when it "issues an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1247 (10th Cir. 2015) (quotations omitted). The district court here acted within its Rule 15(a)(2) discretion for two reasons.

---

[14] Federal Rule of Civil Procedure 16(e) may also apply because, although the court had not entered the pretrial order when Mr. Teran requested leave to amend, it had entered it by the time it considered Mr. Teran's request. Rule 16(e), which governs the "Final Pretrial Conference and Orders," permits amendment of a final pretrial order "only to prevent manifest injustice." Its "manifest injustice" standard is more stringent than Rule 15's "freely give leave" standard. As explained below, the district court acted within its discretion in denying Mr. Teran's request to amend under Rule 15(a)(2). Because Rule 15(a)(2) is the more lenient of the two rules as to Mr. Teran, we need not address Rule 16(e).

- 22 -

First, we agree with its rejection of Mr. Teran's "gotcha tactic" argument. Mr. Teran's assertions of bad faith delay tactics are conclusory and lack factual support. Nor did Defendants manufacture the Second Call Right through the litigation. On the contrary, they contracted with Mr. Teran for it pre-litigation. Further, Defendants did not reverse their position. They have consistently argued Mr. Teran lost his shares when GB Miami exercised the First Call Right. Their argument that he lost his shares when GB Miami exercised the Second Call Right is an additional argument, not an inconsistent one. Nor does their motion to dismiss the First Amended Complaint contradict their motion for summary judgment on his Second Amended Complaint. The former argued his individual claims failed because he did not allege individual harm. The latter argued his amended derivative claims failed because he was no longer a shareholder. Defendants were entitled to make both arguments.

Second, we agree with the district court's conclusion that Mr. Teran's request to amend was untimely. When the district court dismissed Counts One and Two in the First Amended Complaint because they failed to allege individual harm, Mr. Teran could have amended the claims to add that allegation. Instead, he changed his claims to derivative ones in the Second Amended Complaint.[15] A year and a half following the dismissal of

_____

[15] Mr. Teran argues he could not have amended Counts One and Two of the First Amended Complaint based on the district court's analysis in its dismissal order. During the pleadings stage, Mr. Teran had argued Kansas law applied and that Kansas law permitted a shareholder to bring an individual suit based on harm to the corporation in limited circumstances applicable here. The district court rejected this argument, concluding in its choice-of-law analysis that Missouri law, not Kansas law, applied.

Continued . . .

the individual claims, Mr. Teran's summary judgment briefing requested leave to "revive" his individual claims should his derivative claims fail. Aplt. Br. at 31. Mr. Teran provided no explanation for his failure to seek leave to amend the claims in this manner earlier. Given the amount of time that had passed and the absence of any explanation, the district court acted within its discretion in denying Mr. Teran's request. *See Duncan v. Manager, Dep't of Safety, City & Cty. of Denver*, 397 F.3d 1300, 1315 (10th Cir. 2005) ("[U]ntimeliness alone is an adequate reason to refuse leave to amend [under Rule 15]."). [16]

---

Nothing in its decision to apply Missouri law precluded Mr. Teran from amending Counts One and Two to allege individual harm.

[16] Mr. Teran also asserts Counts One and Two of the First Amended Complaint did allege individual harm. Count One, for example, alleged GB International's conduct "caused Teran to lose significant sums and miss business opportunities." Aplt. Br. at 33 (quoting Count One of First Amended Complaint). Count Two, for example, alleged GB International's conduct caused Mr. Teran to "los[e] the orders from [the stolen Latin American] customers" and "the opportunity to procure more business from these customers." *Id.* (quoting Count Two of First Amended Complaint).

This argument does not challenge the court's decision to deny leave to amend the Second Amended Complaint. It challenges the court's decision to dismiss Counts One and Two from the First Amended Complaint based on a failure to allege individual harm. As to that decision, the district court explained in its dismissal order that Mr. Teran may have alleged he lost clients, but those clients were ACTP's clients. Mr. Teran did "not allege that he maintained his own customer base or explain how he incurred any separate damage as a result of his origination of these customers and thus, any action seeking relief must be brought derivatively." *Teran v. GB Int'l, S.P.A.*, 920 F. Supp. 2d 1176, 1187 (D. Kan. 2013). Mr. Teran has forfeited any argument to the contrary by failing to respond to the district court's reasoning on appeal.

## D. *Count Three*

Count Three fails based on our resolution of GB Miami's counterclaim. Count Three, brought under the Kansas Declaratory Judgment Act, Kan. Stat. Ann. § 60-1701 *et seq.*, sought a declaratory judgment that Mr. Teran continues to own ACTP stock because Mr. Teran did not resign; the First Call Right consequently did not exist; and GB Miami's exercise of the First Call Right was accordingly invalid. But, as explained above, Mr. Teran lost his shares when GB Miami validly exercised the Second Call Right. The exercise of the Second Call Right therefore precludes a declaratory judgment that Mr. Teran retains ownership over his shares. We accordingly affirm summary judgment on Count Three.

## E. *Count Four*

Count Four, brought alternatively to Count Three, alleged GB Miami breached the Shareholders Agreement by exercising the First Call Right even though Mr. Teran had not resigned. It alleged GB International also breached the Shareholders Agreement "to the extent [it] was acting through its affiliate GB Miami in exercising" the First Call Right. App. at 145. We affirm the grant of summary judgment as to both GB Miami and GB International.

### 1. **GB Miami**

We affirm as to GB Miami because Mr. Teran has not shown GB Miami failed to perform a duty under the Shareholders Agreement. A "breach of contract . . . is the failure to perform a duty arising from a contract . . . ." *David v. Hett*, 270 P.3d 1102, 1114 (Kan. 2011); *see also Kan. Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*,

936 P.2d 714, 718 (Kan. 1997) ("A breach of contract may be said to be a material failure of performance of a duty arising under or imposed by agreement." (quotations omitted)).[17]  A duty may exist based on an express term in a contract or the implied duty of good faith and fair dealing.  *See Waste Connections of Kan., Inc. v. Ritchie Corp.*, 298 P.3d 250, 266 (Kan. 2013) (explaining that, under the implied duty of good faith and fair dealing, a party agrees not to "do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (quotations omitted)).

We affirm because Mr. Teran has failed to identify an express or implied duty that GB Miami allegedly breached.  He instead argues the First Call Right did not exist under the Shareholders Agreement because he did not resign.  In short, he asserts the non-existence of a right, not the non-performance of a duty.  His request that we conclude the First Call Right did not exist under the Shareholders Agreement is properly brought in Count Three's request for a declaratory judgment.  *See* Kan. Stat. Ann. § 60-1704 (Kansas Declaratory Judgment Act) ("Any person having an interest under a . . . written contract . . . may obtain a declaration of rights . . . thereunder.").  It is not properly brought as a breach of contract claim because it fails to identify a contracted-for duty that

---

[17] *See also* Restatement (Second) of Contracts § 235(2) (Am. Law Inst. 1981) ("When performance of a duty under a contract is due any non-performance is a breach."); *Breach of Contract*, Black's Law Dictionary (10th ed. 2014) (defining a breach of contract as the "[v]iolation of a contractual obligation by failing to perform one's own promise, by repudiating it, or by interfering with another party's performance"); 23 Williston on Contracts § 63:1 (4th ed.) ("[A] breach of contract is a failure, without legal excuse, to perform any promise that forms the whole or part of a contract.").

GB Miami failed to perform. We therefore affirm summary judgment for GB Miami on Count Four.

2. **GB International**

Count Four's claim against GB International is predicated on its claim against GB Miami. It alleged GB International breached the Shareholders Agreement only "to the extent [it] was acting through its affiliate GB Miami in exercising" the First Call Right. App. at 145. The failure of Count Four against GB Miami is therefore fatal to its claim against GB International.

* * * *

For these reasons, we affirm the grant of summary judgement on Counts Three and Four.

## F. *Count Five*

We affirm the grant of summary judgement on Count Five against GB International and ACTP. Count Five, brought on Mr. Teran's individual behalf, alleged GB International and ACTP breached the Shareholders Agreement by amending the Supply Agreement without obtaining the approvals required under the Approval Rights Provision. Mr. Teran brought Count Five as an individual claim, not a derivative claim.

The district court granted summary judgment to GB International on the ground that the Approval Rights Provision bound only ACTP. It granted summary judgment to ACTP by concluding Mr. Teran could not bring Count Five in his individual capacity because he failed to allege he suffered individual harm. He instead alleged harm to ACTP.

We agree Count Five fails as an individual claim because it alleges no individual harm. Because this ground is sufficient to affirm as to both Defendants, we need not address whether GB International is additionally entitled to summary judgment because the Approval Rights Provision did not bind it.

1. **Applicable Law**

Count Five implicates a shareholder's right to bring a breach of contract claim individually rather than derivatively. Defendants' brief cites Missouri law. Mr. Teran argues Kansas law governs. Either way, the outcome is the same.

Courts from both states have required a plaintiff alleging harm to the corporation to bring a derivative suit. "When a corporation has been injured by the actions of those in control thereof, the well-established general rule is that the suit seeking redress for such a grievance belongs to the corporation and must be brought as a derivative action, meaning one or more shareholders may bring suit on behalf of the corporation for harm done to the corporation." *Lightner v. Lightner*, 266 P.3d 539, 545 (Kan. Ct. App. 2011). As a result,"[s]hareholders do not have standing to [individually] sue for harms to the corporation or even for the derivative harm to themselves that might arise from a tort or other wrong to the corporation." *Id.*; *see also Halley v. Barnabe*, 24 P.3d 140, 146-48 (Kan. 2001) (discussing the same requirement in the context of limited liability companies); *Nickell v. Shanahan*, 439 S.W.3d 223, 227 (Mo. 2014) (explaining claims based on injuries "to the corporation as whole" must be brought derivatively); *Cook v. Cook*, 143 S.W.3d 709, 711 (Mo. Ct. App. 2004) ("A shareholder is without standing to sue in his individual capacity for damages to the corporation." (quotations omitted)).

Courts have adopted this rule to avoid "a multiplicity of suits, and a consequent possibility that those who brought the latter suits would not be able to receive a full recovery." *Centerre Bank of Kan. City, Nat'l Ass'n v. Angle*, 976 S.W.2d 608, 613 (Mo. Ct. App. 1998).

Thus, to bring an individual claim in either state, a shareholder must allege an individual harm beyond that suffered by the corporation and its shareholders. *See Lightner*, 266 P.3d at 545 (holding a shareholder may bring an individual claim if "he or she has suffered an injury that is not dependent on an injury to the corporation" and the shareholder can therefore "prevail without showing an injury to the corporation" (quotations omitted)); *Nickell*, 439 S.W.3d at 227 ("Individual actions are permitted, and provide the logical remedy, if the injury is to the shareholders themselves directly, and not to the corporation." (quotations omitted)); *Centerre Bank of Kan. City*, 976 S.W.2d at 614 (holding plaintiffs must "have been harmed individually," and they may not bring individual actions if they allege wrongful conduct "directly harmed the corporation, and only indirectly harmed them in various amounts in their capacities as shareholders").

2. **Analysis**

Mr. Teran may not bring Count Five in his individual capacity because he failed to allege any individual harm; he alleged only harm to ACTP. More specifically, he alleged the breach of the Approval Rights Provision was "detrimental to ACTP's business," "led to the loss of sales and profits for ACTP," "caused ACTP to lose a great deal of money," "made ACTP less attractive to customers," and made "ACTP's profit margin shr[i]nk dramatically." Aplt. App. at 147-48, ¶¶ 126-28, 131. In sum, he alleged the breach of

- 29 -

contract caused "ACTP to continuously lose money and leave no profit margin or real revenues from which to pay the shareholders, including Teran." *Id.* at 148, ¶ 134. He therefore failed to allege he suffered any individual harm other than indirect harm as a shareholder.[18] Mr. Teran's arguments to the contrary are unpersuasive.

First, Mr. Teran argues he alleged individual harm, citing other provisions in the Shareholders Agreement giving GB International the right to purchase other shareholders' stock.[19] He asserts these provisions afforded other shareholders purchase prices worth millions of dollars—well in excess of the purchase prices applicable to him. He argues, "[t]his means that no matter what improper actions GB [International] engaged in to damage ACTP, [these other individual shareholders] would not be damaged like Teran"; they would receive higher purchase prices "if GB [International] called their shares due." Aplt. Br. 42. In contrast, GB International "could systematically destroy the value of ACTP and cause harm to Teran—harm that was separate and distinct from that caused to the other shareholders as it related solely to the Call Right for Teran's shares." *Id.*

---

[18] This is not to say his claim, as pled, would have succeeded had he brought it derivatively. To bring a breach of contract claim against ACTP on behalf of ACTP "would lead to the confounding possibility that a shareholder of a corporation could bring a derivative action on behalf of the corporation against the corporation itself." *In re Stillwater Capital Partners Inc. Litig.*, 851 F. Supp. 2d 556, 569 (S.D.N.Y. 2012) (quotations omitted). Our point is only that Mr. Teran needed to allege individual harm if he wished to bring a breach of contract claim on his own behalf.

[19] Although the Shareholders Agreement gave GB Miami call rights to purchase Mr. Teran's stock, it gave GB International call rights to purchase the other shareholders' stock.

We are unpersuaded.  Mr. Teran theorizes other shareholders would have made more money if GB International had called their shares due.  But he never alleged GB International did so.  Even if GB International had purchased their shares for a higher price, any resulting individual harm would not be attributable to ACTP and GB International's failure to obtain the necessary approvals before amending the Supply Agreement—the basis of Count Five.  It would instead arise from the parties' insertion of different purchase prices into an entirely different section of the Shareholders Agreement.

Second, Mr. Teran invokes a Kansas exception to the general rule that individual claims must allege individual harm.  This exception, recognized in *Lightner*, provides that if a corporation is closely held, a court may treat "an action raising derivative claims as a direct [(meaning individual)] action" if doing so will not "(1) unfairly expose the corporation to a multiplicity of actions; (2) materially prejudice the interests of creditors in the corporation; or (3) interfere with a fair distribution of the recovery among all interested persons." *Lightner*, 266 P.3d at 546 (quotations omitted).[20]

Even if Kansas law applies, Mr. Teran does not fall under *Lightner*'s exception. *Lightner* explained a plaintiff fails to satisfy the second requirement—no material prejudice to creditor's interests—if he or she seeks judgment against the corporation itself.  By seeking judgment against the corporation, the plaintiff exposes the

---

[20] Mr. Teran has arguably waived his *Lightner* argument by failing to raise it in his district court briefing on Count Five.  Because he did raise the *Lightner* exception in his discussion of Counts One and Two in his response to Defendants' motion to dismiss the First Amended Complaint, we address and reject his invocation of that exception on the merits.

corporation's assets and thereby imperils the interests of its creditors. *Id.* at 548-49 ("It would be difficult to imagine any more prejudicial outcome for the Corporation's creditors."). Mr. Teran seeks a judgment against ACTP itself. He therefore fails to satisfy *Lightner*'s second requirement.

We therefore affirm summary judgment for ACTP and GB International on Count Five.

## III. **CONCLUSION**

For the foregoing reasons, we affirm.

ENTERED FOR THE COURT,


Scott M. Matheson, Jr.
Circuit Judge